FILED

2013 Mar-15  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| JESSICA CHAPMAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  2:08-cv-01247-HGD |
| | ) | |
| FRED'S STORES OF TENNESSEE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

The above-entitled civil action is before the undersigned magistrate judge on the Motion to Facilitate Notice filed by plaintiff.  (Doc. 34).  A hearing on the motion was held on March 25, 2009.  Present were Gregory Wiggins for plaintiff and Stuart Roberts for defendant.  After consideration of the motion, defendant's opposition, and the arguments of the parties at the hearing, the undersigned makes the following report and recommendation.

Plaintiff filed the complaint on July 15, 2008, alleging defendant Fred's Stores of Tennessee, Inc. (Fred's) violated the Equal Pay Act (EPA), 29 U.S.C. § 206(d). Plaintiff was employed by defendant as an Assistant Store Manager.  She alleges that defendant willfully paid plaintiff and other female Assistant Store Managers less than

male Assistant Store Managers.  Plaintiff Chapman seeks to represent herself and all other females employed by defendant as Assistant Store Managers within the last three years.  A large number of females (58) already have filed consents to become party plaintiffs.

In the Motion to Facilitate Notice, plaintiff avers that Fred's operates over 650 stores in 15 states.  She believes there are thousands of similarly situated female Assistant Store Managers.  Plaintiff asserts that she has met the requirements for conditional certification of a class and points out that allowing notice to potential plaintiffs is not a ruling on the merits.

Fred's is a discount retail company headquartered in Memphis, Tennessee, consisting of over 600 stores in 15 states, mostly in the Southeast.  (Doc. 41, Ex. A, Decl. of Ricky Pruitt, at ¶2).  The retail store operations are divided into five regions (with roughly eight districts in each region) and 38 districts (with roughly 18 stores in each region.  (*Id.*).

Until approximately February 2008, each Fred's Store generally had a Store Manager and an Assistant Manager.  (*Id.* at ¶ 3).  Each store also may have employed an Operations Manager and up to four experts (Service Expert, Apparel Expert, Consumables Expert, Home Expert).  (*Id.*).  Most Fred's stores have part-time associates, the number of which varies from store to store.  (*Id.*).  Further, some stores also hire seasonal employees during periods of higher customer and sales volumes.

(*Id*.).  Store Managers and Assistant Managers are paid on a salaried basis, and they run the store, including supervision of all other employees in the store.  (*Id*.).

According to the declarations submitted by defendant, the hiring of Assistant Store Managers (ASM) is conducted primarily by the District Manager over the store in question, working in conjunction with the Regional Training Development Manager (RTDM).  (Doc. 41, Ex. A., at ¶ 7; Exs. E-G at ¶ 6).  The management candidates can consist of existing employees or outside candidates who submit an application for the position.  The District Manager (DM) and RTDM may interview the candidates separately or together, and the DM typically has superior knowledge of the store in which the ASM vacancy exists and any specific needs.

After completion of the interviews, the DM and RTDM discuss the candidates and determine which candidate will be offered the position, a decision in which the DM's opinion carries significant weight.  (Exs. E-G ¶¶ 8, 9; Ex. A ¶¶ 10, 11).  The Store Manager also may provide input for the decision.  (*Id.*).  After the DM and RTDM decide which candidate will be offered the job, they discuss the salary to be paid.  The salary depends on the store's ability to stay within its budget, and spend store assets effectively and efficiently, and salary decisions are not made without the DM's approval.  (Exs. E-G ¶ 9; Ex. A ¶ 10).

The salary offered to an ASM candidate is based on a wide variety of factors, including the candidate, the store with the vacancy and the overall labor market in

which the store exists.  The weight given each factor varies in each instance.  (Exs. E-G, ¶ 10; Ex. A ¶ 11).  With respect to the salary offered, the candidate's past relevant work experience is important, especially past management experience in retail.  Past management experience may result in a higher salary offer and lack thereof may result in a lower offer.  (Exs. E-G, ¶ 11; Ex. A ¶ 10).  DMs also may recommend a higher salary for candidates who are already employed as opposed to an unemployed candidate.  (Exs. E-G, ¶ 12; Ex. A ¶ 13).

With respect to the particular store needing an ASM, the sales volume of the store is a key consideration; stores with higher gross sales often have higher labor budgets, allowing a higher salary offer.  The employees at a busier store also typically work more hours, requiring more supervision by an ASM.  Such positions generally are offered to candidates with more experience, thus resulting in a higher salary.  (Exs. E-G, ¶ 12; Ex. A ¶ 13).  Further, stores with a high degree of theft loss would look for an ASM with greater potential to address the problem, so an applicant with past loss prevention experience or a history of successfully controlling theft loss may be offered a higher salary.  (Exs. E-G, ¶ 13; Ex. A ¶ 10).

With respect to the local labor market factor, defendant states that it has stores in a wide variety of markets, from rural outposts to medium-sized towns to bustling metropolitan areas.  (Ex. A ¶ 3).  Areas with thriving economies typically have more competition for qualified labor, requiring defendant to offer higher-than-average

salaries to attract qualified candidates. (Exs. E-G ¶ 15). On the other hand, smaller markets or markets with struggling economies offer greater leverage to defendant to pay lower salaries. (*Id*.).

In addition to these factors, a higher salary may be offered to a well-qualified Store Manager when no Store Manager positions are open, to retain the candidate as an ASM until a Store Manager position opens. A Store Manager at a store which is closing may be offered a temporary position as an ASM at another store, until a Store Manager position becomes available, but be kept at a Store Manager salary. (*Id.*). Further, a Store Manager may be demoted to ASM, but the past Store Manager experience may be reflected in the salary. (*Id.*). Finally, an ASM hired from outside Fred's may command a higher salary based on past management experience than a Fred's hourly associate promoted to ASM who does not have past managerial experience. A promoted hourly associate without past experience is usually started at the minimum annual salary of $23,660 per year. (Exs. E-G ¶ 17; Ex. A ¶ 18).

In over 90% of cases, the salary recommendation made by the DM and RTDM does not require approval from regional or corporate management and is communicated to the candidate. (Exs. E-G ¶ 19; Ex. A ¶ 20). Exceptions to this rule are seen when the initial salary offer to an ASM candidate is significantly higher than normal. In that event, the Regional Vice President (RVP) above the District Manager and/or the Executive Vice President (EVP) will review and approve the higher salary

proposal.  (*Id.*).  In such cases, the DM usually calls the RVP or Jordan Resnick, Fred's Vice President of Human Resources–Store Operations, who reviews the case for the EVP, to obtain approval for the higher salary, and approval usually is given. (*Id.*).

District Managers and Store Managers also are responsible for proposing annual raises for ASMs.  (Exs. E-G ¶ 20; Ex. A ¶ 22).  Raises are based primarily on performance and feedback from Store Managers.  However, budget constraints within the store, and the profitability of the store and the company in general can affect the amount of raises.  (*Id.*).  At least 90% of raises recommended by DMs and Store Managers are implemented without scrutiny by their superiors.  On some occasions, the RVP may ask the DM to explain the reasoning behind a higher-than-usual raise, but the RVP normally approves such raises.

Plaintiff has submitted emails to and from Jordan Resnick, in support of her assertion that salary and raise decisions are more centralized.  (*See* Doc. 45, Plaintiff's Reply, at Ex. C).  The emails reflect that Resnick directed RTDM Barry Sundman to obtain advance approval from Resnick before offering any ASM a salary in excess of the minimum $23,660.  Sundman also was prohibited by Resnick in March 2007 from approving any hires or promotions before talking with Resnick. Also, in July 2007, Resnick prohibited Sundman from hiring any extra Managers or ASMs without prior written approval, to avoid hiring for a position that did not exist.

These emails indicate that Resnick exercised more control over ASM salaries and raises than defendant's evidence would suggest.  The evidence submitted by plaintiff also sets out specified instances where approval at higher than the DM/RTDM level was required.  Regional Vice President approval was required for any applicant who was fired from a previous job or who quit without notice.  The loss prevention department was required to approve any hire of a candidate who was fired for loss prevention issues or any rehire of a previous DM or ASM.  Resnick also had to approve any rehires into a Manager or ASM position.  (Doc. 45, Ex. C, email from Jordan Resnick dated February 16, 2007).

In response, defendant has submitted a declaration from Resnick (Doc. 50) which he explains in a footnote that the emails represent a small minority of cases in which he became involved in salary discussions.  He iterates that the majority of decisions went through without his input, and he only offered coaching to employees making salary recommendations of the best way to go about making those recommendations.  He asserts that the pay rate ultimately given is the same as the original DM recommendation and only in a small minority of the instances is the rate based on Resnick's counsel.  The emails do tend to show the high approval rate of decisions that were sent up to Resnick for review.

Plaintiff also relies heavily on the conditional certification orders in *Collins v. Dollar Tree Stores, Inc.*, 2:08-cv-01267-WMA, and *Womack v. Dollar General*, 2:06-

cv-00465-VEH.   Both these cases arose under the EPA and in both cases, a nationwide class was conditionally certified.  A nationwide class was found to be appropriate based on a salary decision model strikingly similar to the one used by Fred's.

In contrast, the declarations submitted by plaintiff in support of the Motion to Facilitate Notice all state (with one exception) that the initial rate of pay for the declarant was decided by the DM.  The declarations further state, "The determination of the initial salary an Assistant Manager will receive, as well as any pay raises, are determined and must be approved by the District Manager, Regional Vice Presidents, Regional Field Recruiters *and/or* Jordan Resnick, Vice President of Human Resources Operations."  (emphasis added).   The inclusion of "and/or" in the declarations does not undermine or contradict defendant's evidence that the RVP or Resnick were involved in the decision only 10% or less of the time.  The declarations actually provide support for defendant's assertion that the DM sets the initial salary for the ASM candidate.  This would make sense in light of the direction by Resnick in his email that ASMs be offered only the minimum possible salary without approval from Resnick; where the DM offered only the minimum salary, as directed, no further approval was needed.

**The Equal Pay Act**

Title 29 U.S.C. § 206(d) provides:

(d) **Prohibition of sex discrimination.**

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

Thus, an employer paying a higher wage to a male employee than a female employee may attempt to justify the differential by seniority, merit, quantity or quality of production or some other, non-gender-based reason.  The justification for a wage differential is considered an affirmative defense by the defendant.

According to the Eleventh Circuit in *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Cir. 1992):

> To establish a *prima facie* case under the Equal Pay Act of 1963, a complainant "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)).  Once a plaintiff makes out a *prima facie* case, the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a

> differential based on any other factor other than sex." *Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. at 2229 (quoting 29 U.S.C. § 206(d)(1)). The jobs held by the employees of opposite sexes need not be identical; rather, they need only be substantially equal. *Corning Glass Works*, 417 U.S. at 203-04, 94 S.Ct. at 2232-33.

*Id.* at 1532-33.

The Equal Pay Act prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a "factor other than sex" is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant. *See Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991).

A plaintiff establishes a *prima facie* case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs. *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1032 (11th Cir. 1985). Because at this stage the jobs and not the employees are compared, only the skills and qualifications actually needed to perform the jobs are considered. *Miranda*, 975 F.2d at 1532-33. *See also Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994) (once *prima facie* case established, defendant must prove by preponderance of evidence that pay differential is justified under one of four affirmative defenses in § 206(d)).

"Initially, the burden rests with the plaintiff to show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility.'" *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (quoting *Schwartz v. Florida Bd. of Regents*, 807 F.2d 901, 907 (11th Cir. 1987)).

The statute also imposes on the plaintiff a "geographic limitation." Those employees against whom plaintiff compares herself must work in the same "establishment" as the claimant. *Brennan v. Goose Creek Consolidated Indep. Sch. Dist.*, 519 F.2d 53, 57 (5th Cir. 1975). A plaintiff establishes a *prima facie* case by satisfying both the geographic and descriptive components of the test as applied to even one comparator. *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir. 1991); *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1009 (11th Cir. 1989).

**<u>Conditional Collective Action Certification</u>**

It is within the court's discretion to grant or deny a motion to conditionally certify and facilitate notice. *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562 (11th Cir. 1991); *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). In *Dybach*, the Eleventh Circuit held that, before facilitating notice, "the district court should satisfy itself that there are other employees . . . who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and

with regard to their pay provisions." *Id.* at 1567-68. These are the general requirements recognized by the Eleventh Circuit. Subsequently, the Eleventh Circuit slightly altered *Dybach*'s two-tiered approach. See *Hipp v. Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001), and *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240 (11th Cir. 2003). In *Cameron-Grant*, the court stated:

> *Hipp* outlined a two-tiered procedure that district courts should use in certifying collective actions under § 216(b), stating as follows:
>
>> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision–usually based only on the pleadings and any affidavits which have been submitted–whether notice of the action should be given to potential class members.
>>
>> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.
>>
>> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives–i.e. the

> original plaintiffs–proceed to trial on their individual claims.

*Id.* at 1243 n.2 (quoting *Hipp*, 252 F.3d at 1218).  The Fifth Circuit has observed, that "[a]t the notice stage, courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination."  *Mooney v. Aramaco Servs. Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995) (citation omitted), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).  Therefore, certification, if granted at the preliminary notice stage, is always conditional.

In establishing whether court-approved notice is to be sent to potential plaintiffs, a plaintiff need only show a colorable basis for a representative suit, and the burden is not difficult to meet.  *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 567 (N.D.Ala. 1995).  At the notice phase, the named plaintiff need only show that there are other possible employees who may desire to opt in and that they are similarly situated with respect to job requirements and pay provisions.  The burden also has been described as requiring a showing of a "reasonable basis for crediting their assertions that aggrieved individuals exist in the broad class that they propose."  *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 362 (M.D.Ala. 1999).  This initial burden is "not a difficult one to establish."  *Mertz v. Treetop Enterprises, Inc.*, 1999

U.S. Dist. LEXIS 18386, *7 (N.D.Ala. March 3, 1999), *citing Bayles v. Am. Med. Response of Colorado*, 950 F.Supp. 1053, 1066 (D.Colo. 1996).  The Eleventh Circuit in *Hipp* stated that it is a "fairly lenient standard, and typically results in 'conditional certification' of a representative class." 252 F.3d at 1218, quoting *Mooney v. Aramco Servs. Corp.*, 54 F.3d 1207, 1213 (5th Cir. 1995).  Plaintiff must satisfy the court that there are other employees of the defendant who desire to opt in and that they are "'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach*, 942 F.2d at 1567-68.  If notice is approved, after the filing of consents by potential plaintiffs and discovery, the court then conducts a certification hearing to evaluate the claims of potential plaintiffs, consider contradictory evidence and make appropriate fact findings as to whether the opt in plaintiffs are similarly situated.  The instant action is at the first stage.

Defendant objects to plaintiff's motion for notice mainly on the ground that the individualized determinations as to skills, experience and duties, with respect to each plaintiff and any comparators identified for that plaintiff, militate against collective action certification.  Defendant also contends (1) plaintiff has not shown there are other similarly situated Assistant Managers or that, if there are, they want to be plaintiffs; (2) individualized determinations are required to establish whether plaintiff can make out a *prima facie* case for herself that she was paid less than a male Assistant Manager in the same "establishment"; (3) judicial efficiency would be

frustrated by a conditional certification of the class; (4) this case cannot be managed as a collective action; and (5) plaintiff has not met her threshold burden under *Dybach*.

Plaintiff has directed the court's attention to a number of similar actions in this court and other courts in which collective action certification has been considered and accepted.

As for cases in this court, in *Collins v. Family Dollar*, 7:04-cv-00553-VEH (N.D.Ala.), an EPA action, the district court issued an order on September 13, 2005, conditionally certifying a class of female store managers in the same two districts in which the named plaintiff was employed as a store manager.  In that case, the named plaintiff and seven other putative opt-in plaintiffs filed detailed declarations with the court, in opposition to defendant's motion to decertify the class, setting out their educational background, where they worked, how they were hired, the basis for their knowledge that there were little to no difference in their job duties and responsibilities, the names of other Family Dollar stores to which they were transferred, who their District Managers were, what districts they worked in, the interaction between the District Manager and the Regional Vice President on pay issues, the fact that payroll was handled from corporate headquarters, the fact that they did not set the store's budget, how they would hire and fire employees, that merchandise for the stores was selected by corporate headquarters, with input from

the District Manager and the Regional Vice President, that merchandise was priced out of corporate headquarters, that they did not have discretion as to unloading merchandise, disciplining employees, customer complaints, the store's hours of operation, store dress code, what storage rentals could be used, what pest extermination and trash control services could be used, and what store supplies could be ordered.  They each also stated that they performed the same job as male store managers, used the same skill, effort and responsibility under similar working conditions as male store managers, and their belief that male store managers were paid more for the same job.  Each consent form stated, "I have personal knowledge and/or a good faith belief that, as a Store Manager, I was paid less than male Store Manager(s) who performed work requiring equal skill, responsibility and effort under similar working conditions as I did."  The action was decertified on December 8, 2006.  As grounds, the court noted the lack of interest by putative plaintiffs in the collective action, as well as significant factual and legal variations among the claims of the named plaintiff and those of the opt-in plaintiffs, making collective adjudication inappropriate.

In the consolidated actions of *Womack v. Dollar General*, 2:06-cv-00465-VEH-RRA (N.D.Ala.) (alleging violation of the EPA and Title VII), and *Wood v. Dollar General*, 2:08-cv-01602-VEH (N.D.Ala.) (alleging violation of the EPA), on November 30, 2007, the district court conditionally certified a nationwide class of

female store managers.  The complaint claimed that the named plaintiff and other female Dollar General store managers were paid less than male store managers who performed jobs of equal skill, responsibility and effort under similar working conditions.  The declarations submitted in support of the conditional certification motion were substantially similar to the declarations in this action, in that the declarants stated "upon information and belief" that female store managers were paid less than similarly situated males in the same or similar positions and that the defendant discriminated against the female store managers with regard to their pay on the basis of their gender.  After successful mediation, the court granted the parties' Joint Motion for Preliminary Approval of Class Action Settlement and Unopposed Motion for Provisional Class Certification, and the actions were dismissed with prejudice based on the approved settlement agreement.

In *Knott v. Dollar Tree Stores*, 7:06-cv-01553-LSC (N.D.Ala.), the district court entered an order on April 17, 2007, conditionally certifying a collective action pursuant to the overtime compensation provisions of the Fair Labor Standards Act (FLSA) on behalf of all store managers of defendant.  (*See* Doc. 62).  The court decertified the collective action on September 19, 2012.  (*See* Doc. 515).

In *Ziegler v. Fred's Discount Store*, 2:06-cv-01153-IPJ (N.D.Ala.), the plaintiffs brought suit for violation of the Fair Labor Standards Act regarding payment of overtime compensation.  By order entered October 5, 2006, the court

granted plaintiffs' Motion to Facilitate Notice to a nationwide class of plaintiffs who worked as Assistant Managers for defendant.  (Doc. 53).  The action was ultimately settled and dismissed without defendant having filed a motion to decertify the class.

In *Collins v. Dollar Tree Stores*, 2:08-cv-01267-AKK (N.D.Ala.), an EPA action on behalf of defendant's female store managers, the court entered an order on December 12, 2008, conditionally certifying a nationwide class of opt-in plaintiffs. (Docs. 66 & 67).  Thereafter, the court entered an order decertifying the class in part because the relevant EPA "establishment" was not nationwide but rather limited to the districts in which the named plaintiffs were employed.  (Doc. 190).  The case subsequently was settled and dismissed.

### Desire to Opt In

Plaintiff has filed consents from 58 current or former ASMs stating their desire to opt in to this action as plaintiffs.  In *Womack*, only 15 consents were filed; nevertheless, the court found that sufficient to satisfy the threshold requirement of showing that there were other employees who desired to opt in.  It is noted that the consents come from 58 employees who were employed in 13 different states in 34 different districts.  Fred's has stores in 15 states and 38 districts.  Therefore, the consents cover the majority of states and districts in Fred's organization.  These opt-in plaintiffs had notice of the suit, and it is not unreasonable to expect that more

ASMs would opt in once given notice.  The court finds that plaintiff, therefore, has met her initial burden of showing there are other employees who desire to opt in.

**Similarly Situated**

Plaintiff also must satisfy the court that the opt in plaintiffs are similarly situated with respect to job requirements and pay provisions.  Defendant contends that plaintiff has not shown and cannot show that there are other ASMs at Fred's who are "similarly situated" to her, as that term is defined under the EPA.  It is contended that the salary and raise decisions being challenged are highly individualized and require analysis of many factors that are unique to each individual plaintiff who has filed or consented to join in tis action, in 60 stores in 13 states.  Defendant argues that consideration of those factors would result in 60 or more "mini-trials" and thus implicates concerns of judicial economy.

Defendant avers that each plaintiff will have to show that she was paid less than a male employee in the same store doing the same work under the same circumstances, and, if so, defendant would respond with evidence to demonstrate that the salary decision at issue was made for reasons unrelated to gender.  Defendant characterizes the analysis required as "highly fact-intensive" regardless of the number of plaintiffs.  (Doc. 40 at 4).  It would require at least 58 individual trials on the issue of liability and damages, each requiring the presence of different witnesses, including more than 30 District Managers and many Store Managers.

All of the consents in this case come from current or former ASMs. The evidence establishes that Fred's has one job description for ASMs. (*See* Doc. 35, Ex. 2, Earl Taylor Depo., at 55-57; Doc. 45, Exs. G-I). There is also one policy and procedure manual that covers all Fred's locations, and one training manual for ASMs. (*see* Doc. 35, Ex. 2, Earl Taylor Depo., at 51-53). Therefore, the job requirements are essentially the same for each ASM. This is true notwithstanding defendant's argument that different stores need ASMs with different talents or experience, depending on the specific needs of each store. While the particular focus of an ASM's job may differ in some respect from store to store, the fact remains that the basic duties an ASM is expected to fulfill remain the same, no matter to which store the ASM is assigned.

With respect to pay provisions, the evidence is that there is a set pay scale or "paychange" for ASMs. *See* Doc. 35, Ex. 7, Resnick Depo, at 32-37. The declarations submitted by plaintiff in support of her motion do reflect varying pay rates. For example, most of the declarants made $455 a week, which was the minimum salary for an ASM during most of the relevant time frame. However, some declarants made from $469 a week up to $558 a week. *See, e.g.,* Brandi Gossett Decl. ($469 a week at the end of her employment as an ASM); Myrna Holman Decl. ($475 a week); Michelle Callahan Decl. ($500 a week); Shirley Clinton Decl. ($505.10 a week); Shelly Welch Decl. ($558 a week at the end of her employment as an ASM).

Nonetheless, these salaries are within the range for ASMs for Fred's. The court finds that the evidence submitted supports the conclusion that the potential opt-in plaintiffs are "similarly situated" with respect to their pay provisions.

Defendant's argument about the individualized salary determinations, while accurate, looks ahead to the merits determination of each plaintiff's *prima facie* case and defendant's affirmative defenses. Courts have held that such considerations are not part of the first tier analysis. Instead, it is saved for the decertification motion stage. *See, e.g., Collins v. Dollar Tree Stores, Inc.*, 788 F.Supp.2d 1328, 1335 (N.D.Ala. 2011); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F.Supp.2d 870, 892-93 (N.D.Iowa 2008); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D.Pa. 2000); *Thiessen v. General Electric Capital Corp.*, 996 F.Supp. 1071, 1080 (D.Kan.1998).

## Establishment

A subset of the "similarly situated" analysis and the related issue of the scope of the conditional class is the relevant "establishment." The court must determine the relevant establishment to determine whether notice should be sent to a nationwide class of potential plaintiffs, or to potential plaintiffs within some smaller geographical area, such as the district in which plaintiff Chapman worked. The EPA, an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., provides in pertinent part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

28 U.S.C. § 206(d).  Section 206(d) expressly applies to FLSA § 216(b), which allows for a collective right of action and the recovery of certain damages.  29 U.S.C. § 216(b).

The Secretary of Labor has defined the term "establishment" as "a distinct physical place of business rather than . . . an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a).  Absent "unusual circumstances," the court presumes that multiple locations do not constitute a single establishment. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994). Section 1620.9(b) states in pertinent part:

[U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.

29 C.F.R. § 1620.9(b).  As interpreted by the Eleventh Circuit, the "hallmarks of [unusual circumstances] are centralized control of job descriptions, salary administration, and job assignments or functions." *Mullhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994) (citation omitted).

In this case, defendant contends that the relevant establishment is the district in which plaintiff Chapman worked because salary determinations are made by district managers, despite the fact that such determinations are reviewed at a higher level.  For example, in *Collins v. Family Dollar*, 7:04-cv-00553-VEH, United States District Judge Virginia Hopkins conditionally certified a class of female Family Dollar store managers of stores in the same two districts in which plaintiff Collins was employed as a store manager.  She found that while many aspects of the plaintiff's job were determined at the corporate level, the decisions as to what store managers were paid initially and received as raises was determined by the district manager, though subject to review by the Regional Vice President.  All stores under the supervision of the plaintiff's District Manager thus constituted a single "establishment."

However, in a later case, *Womack v. Dollar General*, 4:06-cv-00465-VEH-RRA, Judge Hopkins conditionally certified a nationwide class based on her finding that Dollar General provided district managers with salary guidelines and required them to obtain permission from regional managers when seeking to go outside those

guidelines.  The involvement of the regional managers in compensation decisions met the "centralized control" test in the analysis at the conditional notice phase.  While district managers usually made salary decisions, the review at the corporate level, and the pay scale set at the corporate level showed the centralized control of salary administration.   Further, the job descriptions and functions also were under centralized control.  These factors are present in this case, as well.  While DMs make the initial salary decisions, their decisions are subject to review at a higher level in many cases and are limited by corporate policy and pay scales.  There is only one job description for the ASM position, one policy and procedure manual and one training manual, all from the corporate level.   Therefore, the relevant establishment for purposes of the Motion to Facilitate Notice is all Fred's stores in the nation.

## Judicial Economy

Defendant has argued that considerations of judicial economy weigh heavily against granting conditional certification.  Plaintiff asserts that any argument about the efficient management of a collective action is a step-two consideration not germane at step one of the conditional collective action certification analysis.  The court notes that in the cases discussed herein in which a collective action was conditionally certified, and the case did not settle before a motion for decertification. a motion for decertification was granted.  *See Collins v. Family Dollar*, 7:04-cv-00553-VEH; *Knott v. Dollar Tree Stores*, 7:06-cv-01553-LSC; *Collins v. Dollar Tree*

*Stores*, 2:08-cv-01267-AKK.  The court cannot ignore the fact that, if a class is (conditionally) certified, it will have to consider approximately 60 separate motions for summary judgment or conduct approximately 60 mini-trials.  The evidence about each individual plaintiff's qualifications and salary and raise determinations will differ, as each factor underlying any pay differential must be considered.

If this action proceeds as a collective action, there would indeed be a large number of mini-trials, in which each plaintiff must establish a *prima facie* case and defendant establish any affirmative defense with respect to that plaintiff.  However, it is questionable if judicial economy would be better served by 60 separate actions in numerous courts.  If plaintiff's motion is denied, the opt in plaintiffs at this point would have the option of filing their own actions.[1]  Granted, some may not choose to pursue individual actions, meaning fewer than 60 actions.  However, some court somewhere must rule on their claims, and this court is as good a forum as any other.

The probability that the class ultimately will be decertified if this action is not settled before then, because of the nature of proof and affirmative defenses in an EPA action, does not mean that conditional certification cannot be granted at this juncture in the case.  While defendant's argument about judicial economy and efficiency is

---

[1] As explained *infra*, the statute of limitations has been tolled for these potential opt in plaintiffs as of the dates they filed their consents to opt in.  *See Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998).

compelling, the lenient standard of *Dybach* and *Hipp* requires that consideration of that factor be postponed until a motion for decertification.  The individualized determinations required in EPA cases have not prevented numerous courts, and indeed district judges of this court, from conditionally certifying even nationwide classes.  While it seems incongruent to conditionally certify a class when there is every possibility that it will be decertified, Eleventh Circuit and district precedent shows otherwise.

**Equitable Tolling**

Plaintiff has asked that the court equitably toll the statute of limitations for opt-in plaintiffs due to the delay in the ruling on the Motion to Facilitate Notice.  "Time requirements in lawsuits between private litigants are customarily subject to 'equitable tolling[.]'" *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990).  Equitable tolling is an "extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993).  However, it is permitted "upon finding an inequitable event that prevented plaintiff's timely action." *Id.* (internal quotation marks omitted). Courts have tolled the statute of limitations in FLSA actions in the interest of justice to protect opt-in plaintiffs' diminishing clams. *See Stransky v. HealthONE of Denver, Inc.*, 868 F.Supp.2d 1178 (D.Colo. 2012); *Baden-Winterwood v. Life Time Fitness*, 484 F.Supp.2d 822 (S.D.Ohio 2007). *C.f. In re Tyson Foods, Inc.*, 2008 WL 4613654

*4 (M.D.Ga. Oct. 15, 2008) (equitable tolling denied where "no action of the . . . court lulled the potential . . . opt-in plaintiffs into inaction"); *Baldozier v. Am. Family Mut. Ins. Co.*, 375 F.Supp.2d 1089, 1092-93 (D.Colo. 2005) (allowing equitable tolling during pre-opt-in period, citing defendant's "refusal to provide contact information for former employees"); *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) (equitable tolling appropriate where plaintiff is unable to discover the existence of the claim).

As explained in *Stransky*,

> Equitable tolling is a doctrine that permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity. *See Truitt v. Cnty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998) (internal citation omitted) ("The propriety of equitable tolling must necessarily be determined on a case-by-case basis."). This equitable tolling doctrine is read into every federal statute, including the FLSA. *See U.S. v. $57,960.00 in U.S. Currency*, 58 F.Supp.2d 660, 664 (D.S.C. 1999) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946)). Moreover, the decision to invoke equitable tolling in a particular case lies exclusively within the sound discretion of the trial court. *See Truitt*, 148 F.3d at 648.

> Courts have equitably tolled statutes of limitations in FLSA actions when doing so is in the interest of justice. *See, e.g. Partlow v. Jewish Orphans' Home of Southern Cal., Inc.*, 645 F.2d 757, 760-61 (9th Cir. 1981) (equitable tolling proper where plaintiffs were without fault and "practical effect of not tolling the statute would be to bar forever any claim" the employees had against defendant), *abrogated on other grounds by Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-cv-0715, 2007 WL 707475 at *8 (N.D.Cal. Mar. 6, 2007) (equitably tolling FLSA statute of limitations because of factors outside plaintiffs' control). Equitable tolling, however, should be

invoked sparingly. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000). Furthermore, "equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Graham-Humphreys*, 209 F.3d at 561-62 (citing *Baldwin Cnty. Welcome Center v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)) ("[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.").

In the case of a collective FLSA action, a least one district court in the Tenth Circuit has explained that the unique circumstances of a collective action "is not only significant but justifies tolling the limitations period [ ] for the FLSA putative class until the court authorizes the provision of notice to putative class members or issues an order denying the provision of notice." *In re Bank of America Wage and Hour Emp't Litig.*, No. 10-MDL-2138, 2010 WL 4180530 (D.Kan. Oct. 20, 2010). In making that equitable tolling determination, the court in *In re Bank of America* utilized a flexible standard, where a court considers five factors in determining whether to equitably toll a statute of limitations: (1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement. *Id.* (citing *Graham-Humphreys*, 209 F.3d at 561).

868 F.Supp.2d at 1181. *But see Sims v. Housing Auth. of City of El Paso*, 2010 WL 3221790 (W.D.Tex. Aug. 13, 2010) (denying equitable tolling for pre-opt-in period absent inclusion by Congress in statute of provision for opt-in plaintiffs' claims to relate back to filing date of lead plaintiff); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106-07 (11th Cir. 1996) (rejecting tolling as of filing of original complaint because "ADEA opt-in plaintiffs are deemed to commence their civil action only when they

file their written consent to opt into the class action" and specific legislative intent that opt-in plaintiffs not have their filing dates relate back to filing of original complaint); *Muhammad v. GBJ, Inc.*, 2011 WL 863785 (S.D.Tex. Mar. 9, 2011) (denying equitable tolling for opt-in plaintiffs who did not meet burden of showing that they diligently pursued their rights yet were "unable to discover essential information bearing on the existence" of their claim, *citing Pacheco v. Rice*, 966 F.2d 904, 906-07 (5th Cir. 1992)).

To join an FLSA collective action, an employee must consent, or "opt in," to the action by filing with the court a written consent to join. 29 U.S.C. § 216(b); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996). "[O]pt-in plaintiffs are deemed to commence their civil action only when they file their written consent to opt into the class action." *Id.* Therefore, an opt-in plaintiff "must file his written consent to opt into the class action prior to the expiration of the statute of limitations on his [FLSA] claim." *Id.* at 1107. Once an individual opts in to an FLSA collective action, the statute of limitations[2] is tolled from the date the consent form was filed, but if the court later denies certification of the collective action and dismisses the opt-in plaintiffs, the statute of limitations resumes upon that dismissal. *E.g., Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998).

---

[2] The FLSA statute of limitations is two years for non-willful violations and three years for willful violations. 29 U.S.C. § 255(a).

The Eleventh Circuit has not spoken on the precise question whether FLSA's statute of limitations may be equitably tolled as to claims of potential opt-in plaintiffs based on a delay in notice to potential class members.  However, a review of Eleventh Circuit authority suggests that equitable tolling does not apply unless a plaintiff is reasonably induced to delay the filing of a claim.  *See Browning v. AT&T Paradyne*, 120 F.3d 222, 227 (11th Cir. 1997) (noting that equitable tolling has been approved where "plaintiff's complaint was untimely as a result of confusing communications from the EEOC" and where "the court led the plaintiff to believe she had done all that was required of her").  In *Browning*, for example, the Eleventh Circuit, emphasizing that its holding was a "very narrow one," tolled the statute of limitations on an employee's Age Discrimination in Employment Act (ADEA) claim because the Equal Employment Opportunity Commission (EEOC) failed to inform the plaintiff of his right to sue or the time limits for doing so and an EEOC investigator misinformed the plaintiff's lawyer of the applicable statute of limitations.  *Id.*  Likewise, the Eleventh Circuit in *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1268 (11th Cir. 2003), tolled the statute of limitations on the plaintiff's ADEA claim because the plaintiff did not reasonably suspect that age discrimination was the reason why her employer eliminated her position until the employer reinstated the position and hired a younger worker to fill it.

In contrast, the Eleventh Circuit declined to toll the statute of limitations in *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435-36 (11th Cir. 1998), because the plaintiff reasonably suspected he was a victim of age discrimination in the period prior to the 180 days before the filing of his EEOC charge.

In *In re Tyson Foods, Inc.*, 2008 WL 4613654 (M.D.Ga. Oct. 15, 2008), the district court considered whether to allow equitable tolling for potential opt-in plaintiffs in an FLSA overtime pay action:

> Here, there has been no showing that any of the potential *Fox* opt-in plaintiffs were reasonably induced to refrain from filing a timely claim. Each potential claimant had the opportunity to file an individual action to vindicate his or her legal rights under FLSA. Moreover, those potential claimants who were aware of the *Fox* litigation had the additional opportunity to opt in to that litigation even though no court-approved notice had been issued. All of the potential opt-in plaintiffs knew that they were performing work "off the clock" and that they were not being paid for it. If potential opt-in plaintiffs did not know about the *Fox* litigation, they could not possibly have been induced to refrain from filing an individual FLSA claim by anything that occurred in that action. For those potential opt-in plaintiffs who were aware of the *Fox* litigation, nothing occurred in that litigation that reasonably induced them to refrain from opting in to that action or filing an individual separate action. There was never a guarantee that the *Fox* court would approve conditional certification, and thus the potential opt-in plaintiffs had no reasonable basis for relying upon possible certification as a basis for delaying the filing of their claims.
>
> Simply put, the potential opt-in plaintiffs had two options for filing a timely claim: (1) opt in to *Fox* if they knew about it, or (2) file separate FLSA claims whether they knew about *Fox* or not. Either way, no action of the *Fox* court lulled the potential *Fox* opt-in plaintiffs into inaction. Thus, no compelling equitable reason exists to allow their

stale claims to be rescued.  For these reasons, the Court declines to apply the extraordinary remedy of equitable tolling here.

*Id.* at *2-*4.

In this case, the delay in sending notice to potential class members has stemmed from a delay in the ruling on the Motion to Facilitate Notice.  In the interim, the statute of limitations, whether two or three years, will have run for many, if not all, potential plaintiffs.  The court notes that Fred's stopped hiring new ASMs and stopped promoting existing employees into ASM positions in February 2008 (*see* Doc.50, Resnick Decl., at n.1).  This delay was through no fault of any potential plaintiff.

There is no showing whether any potential class member refrained from filing a separate action because of the pendency of the Motion to Facilitate Notice and because they expected to receive some notice to join this litigation.  If any female ASM knew of this action, she could have filed a consent to opt in, as at least 58 others did.  In contrast to the situation in *Tyson Foods*, however, this is an EPA action rather than an overtime pay action.  While the plaintiffs in *Tyson Foods* were aware they were working off the clock and not getting paid for that time, female ASMs may have been completely unaware that male ASMs may have been paid more, assuming *arguendo* plaintiff's allegation to be true.

Therefore, it is recommended that the statute of limitations be equitably tolled for the period from August 3, 2009 (a date by which notice reasonably could have been sent to potential plaintiffs) to the date on which this report and recommendation is adopted and accepted.

## CONCLUSION

Based on the foregoing, it is RECOMMENDED that plaintiff's Motion to Facilitate Notice be GRANTED; that the court CONDITIONALLY CERTIFY a nationwide class of all female Assistant Store Mangers of defendant within three years prior to August 3, 2009; that the court order defendant to provide to plaintiff the names and last known physical address of all individuals in the putative EPA class; that the court allow notice of this action to be sent to all potential plaintiffs, as identified from the information provided by defendant, in the proposed form attached by plaintiff as Exhibit 1  to the Motion to Facilitate Notice; and that the court find that the statute of limitations be equitably tolled for the period from August 3, 2009, to the date of entry of the order adopting and accepting this report and recommendation.

## NOTICE OF RIGHT TO OBJECT

The parties are DIRECTED to file any objections to this Report and Recommendation within a period of fourteen (14) days from the date of entry. Any objections filed must specifically identify the findings in the magistrate judge's recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the district court.

Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report shall bar the party from a *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 15th day of March, 2013.

 

 

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE